U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 MAR 26 AM 11: 56

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DYLAN JOHN STANLEY,    )
                       )
        Petitioner,    )
                       )
    v.                 )    Case No. 2:26-cv-00006
                       )
KATHRYN ANN STANLEY,   )
                       )
        Respondent.    )

**OPINION AND ORDER GRANTING PETITIONER'S
PETITION TO RETURN THE CHILD**
(Doc. 1)

On January 15, 2026, Petitioner Dylan John Stanley ("Petitioner"), a citizen and resident of Australia, filed a petition under the Hague Convention on International Child Abductions (hereinafter the "Convention"), and the International Child Abduction Remedies Act ("ICARA"), seeking return of his approximately five-year-old child, P.S., to Australia (the "Petition"). (Doc. 1.) He alleges that Respondent Kathryn Ann Stanley ("Respondent") wrongfully removed P.S. from Australia to the United States on or about September 29, 2025.

On January 16, 2026, the court issued a temporary restraining order ("TRO") wherein it ordered that Respondent submit P.S.'s passports to the court's custody and that P.S. not be removed from the District of Vermont during the pendency of the proceedings. (Doc. 6.) The court held a scheduling conference on January 29, 2026, at which it set the matter for a bench trial and extended the TRO through the conclusion of litigation. (Doc. 20.) Respondent answered the Petition on February 12, 2026. (Doc. 29.) The court conducted a bench trial on March 3, 2026, and March 6, 2026, at which Petitioner; Respondent; Petitioner's mother, Debra Anne Stanley; Respondent's mother, Caron Forsyth; Respondent's therapist, Anne Woodhouse, Ph.D.; and Respondent's expert witness, Peter Favaro, Ph.D., testified.

Petitioner is represented by Anthony L. Bamrick, Esq., and Kristen J.E. Connors, Esq. Respondent is represented by Richard Min, Esq., Camilla Redmond Costa, Esq., and Barney L. Brannen, Esq.

## FINDINGS OF FACT

Based upon the evidence presented, the court makes the following findings of fact:

1.      Petitioner, Dylan John Stanley, was born in February of 1989, is thirty-seven years old, and is a citizen of Australia.

2.      Respondent, Kathryn Ann Stanley, was born in December of 1991, in the United Kingdom, is thirty-four years old, and is a citizen of both the United States and the United Kingdom. She was working on obtaining Australian citizenship at the time of the events set forth herein.

3.      Petitioner and Respondent (the "Parties") are the parents of P.S., who was born in October of 2020 in Australia. P.S. is a citizen of both Australia and the United States.

4.      The Parties met in the United States in 2015 while Petitioner was on a vacation there. They maintained contact thereafter, and Respondent subsequently moved to Australia in 2015. Shortly after her relocation to Australia, Respondent moved into Petitioner's home.

5.      Petitioner has a fifteen-year-old daughter ("A.S.") born in April of 2010 from a prior relationship. Within months of the Parties moving in together, A.S., who was approximately five years old at the time, was relinquished by her biological mother to Petitioner's care. Petitioner has full legal and physical parental responsibilities with regard to A.S., who has lived full-time with Petitioner for the past ten years.

6.      The Parties were married on October 26, 2019, in New South Wales, Australia.

7.      When P.S. was born, the Parties' relationship was challenged because P.S. was a colicky baby who cried frequently and was "difficult to settle." Petitioner found P.S.'s persistent crying especially challenging because it interfered with his sleep, and at

2

that time, he was working ten-hour days, four days a week while Respondent was home caring for P.S.

8. As P.S. entered "the terrible twos," the Parties increasingly disagreed regarding parenting styles. Petitioner believed in a "firm hand" and consequences, and Respondent took a gentler approach which Petitioner felt was too lax. Neither parent ever physically disciplined A.S. or P.S. Each parent occasionally raised his or her voice. Although Respondent testified that Petitioner called P.S. "son of Satan" and "devil's spawn," she provided no dates or context for these comments, and they appear to have occurred infrequently and without malicious intent.

9. Until their separation, the Parties, A.S., and P.S., lived together in New South Wales, Australia. P.S. attended daycare in Forest Hill, New South Wales, from January 2023 until September 29, 2025, five days per week while the Parties worked outside the home. P.S. was registered to begin kindergarten at Forest Hill Public School starting in February 2026.

10. Prior to his removal, P.S. attended kickboxing and swimming lessons and engaged in a wide array of family activities. Both Petitioner and Respondent took care of P.S., and he is closely bonded to both of them, as well as A.S. P.S. also has a close relationship with Petitioner's family in Australia, and Petitioner's parents frequently babysat P.S.

11. Prior to his removal, P.S. visited the United States once when he was approximately eighteen months old. Otherwise, he has resided continuously in Australia since his birth.

12. During the Parties' relationship, approximately once or twice a month, they used methamphetamine, including while caring for A.S. and P.S., which would result in the Parties staying awake for twenty-four to forty-eight hours. Petitioner represents that he is currently sober and has tested negative for any drugs as of January 30, 2026. He provided drug test results to corroborate this claim. Respondent credibly testified she last used methamphetamine in August of 2025.

3

13.    Although Petitioner did not prevent Respondent from having contact with her family, he did not encourage it. He also limited his contact with Respondent's family, but there is no evidence that he affirmatively limited Respondent's or P.S.'s contact with them. Throughout their marriage, the Parties had arguments, sometimes in the presence of their children. Neither of the Parties described those arguments as involving either physical violence or threats of physical violence.

14.    Following her father's death in late 2020, Respondent inherited approximately $250,000. Petitioner wanted to use that money to start a business. Respondent wanted to use some of it to take a holiday, believing it would help Petitioner's mental health. The issue of how to spend Respondent's inheritance was an ongoing source of strife between the Parties. Respondent credibly described Petitioner as controlling, domineering, and manipulative as he complained about her unwillingness to invest her inheritance in his business ventures.

15.    In May of 2022, the Parties, A.S., and P.S. traveled to the United States to attend Respondent's late father's funeral. They had several arguments during the trip, none of which involved physical violence or threats of physical violence. In general, Petitioner was insufficiently sensitive to Respondent's grief and her need to spend time with her family.

16.    After the funeral, the Parties, A.S., and P.S. traveled to the U.S. Virgin Islands to visit Respondent's mother and her stepfather. Respondent's sister and her sister's fiancé joined the trip. During the visit, the Parties and A.S. slept in a dwelling on the property, separate from but near the main dwelling. P.S. slept in Respondent's mother's bedroom at Petitioner's request. Respondent's mother credibly testified that, during a catamaran outing she organized, Petitioner was insistent that P.S. not wear a life jacket because P.S. would be uncomfortable. She perceived this as a "power play" by Petitioner. P.S. ultimately wore a life jacket on the outing. On another occasion, while Respondent went out for drinks with family and friends until approximately 11:00 p.m., Petitioner took care of P.S. and put him to bed in his mother-in-law's bedroom while

Petitioner went to sleep in the separate dwelling nearby. The court does not find these incidents rise to the level of child neglect or abuse.

17.     In May of 2025, in large part due to work stress, Petitioner made a number of statements that reflected suicidal ideation expressing a desire to "blow his brains out" or recounting a dream that he had hung himself. Respondent responded with concern and, on May 15, 2025, messaged Petitioner:

> So this is what's going to have to happen[,] and [I']m going to be a pain in the ass about this. I'm booking you an appointment to see a [general practitioner] to get a mental health plan done tomorrow. I'm going to also get you an appointment with Annie, who I see. I'm going with you to the appointment and talking to [the] doctor about what's going on and you will go and see Annie. If you fight me on this[,] I will be forced to schedule you, which is a trip to the psych ward[,] and then you will [lose] your guns and your gun license.

(Resp't Ex. I.)

18.     On May 16, 2025, Petitioner loaded his truck with his firearms and announced his intention to take them to his brother's house approximately two hours away. Because of the four-hour round trip, Petitioner would miss his scheduled appointment with the general practitioner if he went forward with his plan. Petitioner left the marital home in his truck with his firearms. He claims he intended to proceed to the police station and surrender his weapons there. Respondent called the police, which intercepted Petitioner en route.

19.     Petitioner was placed in a psychiatric facility for observation over the weekend. During this time period, Petitioner's gun license was suspended. Petitioner blamed Respondent for his hospitalization, messaging her on the first day he was in the facility:

> All I know[ i]s after this[ t]here's no way back. Any chance that existed[ i]s gone. I'll be here all weekend. I'm getting federal charges laid against me. I don't get to see my kid. My bed. My dogs. All because of you. I solely and only blame you. And what you did today I don't think I can ever forgive you for[.]

(Resp't Ex. J.)

5

20.    In the course of Petitioner's hospitalization, his psychiatrist spoke to Respondent. Respondent advised that Petitioner's suicidal ideation was of a recent onset and a few weeks ago there had been no problem. She further advised there was no domestic violence.

21.    When Petitioner was released from the hospital, he chose not to renew his gun license, and all firearms were removed from the marital property.

22.    Petitioner remained angry with Respondent regarding her role in his psychiatric hospitalization. The marital relationship broke down.

23.    On September 15, 2025, after an argument regarding how to use Respondent's inheritance, Petitioner stayed at a motel while Respondent remained in the marital home with P.S. and A.S. At this point in time, the Parties began discussing the dissolution of their marriage and the possibility that Respondent would relocate to the United States with P.S. The Respondent retained a family law lawyer in Australia.

24.    On September 17, 2025, the Parties independently decided to attend P.S.'s kindergarten orientation at his elementary school. Petitioner learned of the orientation from A.S. In the parking lot, Petitioner attempted to take P.S. out of his car seat. Respondent intervened and tried to prevent Petitioner from removing P.S. Petitioner placed his hand on Respondent's wrist to try to stop her. Respondent took P.S. and ran with him into the school. Respondent later called the police and reported the incident as domestic violence. The Australian Police contacted Petitioner and, when Petitioner explained what had happened from his perspective, the Australian Police declined to pursue the matter further.

25.    The Parties separated on September 18, 2025. At that time, Respondent was staying at a friend's house with P.S. while Petitioner was in the marital home with A.S. Petitioner packed up a significant portion of everyone's belongings and placed them in suitcases and bags outside the front entrance of the marital home. The Parties then met at the martial home with each of their mothers present as witnesses. Petitioner recorded the

conversation but later destroyed the recording.[1] All four participants to the meeting testified to its contents with general agreement that the meeting initially focused on who would live in the marital home, finances, possessions, vehicles, and contact between Respondent and A.S. Respondent raised the topic of P.S. At this point, the accounts of the meeting diverge. It is undisputed that the subject of Respondent moving to the United States with P.S. was discussed. Petitioner commented that if Respondent wanted to leave, he would not stop her. Respondent and Petitioner's mother recall Respondent raising the possibility that she would remain in Australia for approximately two years. Petitioner's mother, who was upset at the loss of her grandson, told Respondent it would be cruel to wait that long if she was planning to leave. After the meeting, Petitioner and A.S. moved out of the marital home and Respondent and P.S. moved back in.

26. On September 19, 2025, Respondent assured Petitioner via text message that she "would never [d]o anything like move back over to America with [P.S.] without [Petitioner's] consent or a court order." (Resp't Ex. R.)

27. Over the following days, the Parties exchanged text messages discussing possible proposals for a parental custody and visitation order. On September 22, 2025, Respondent proposed that she retain sole parental responsibility of P.S. and further proposed that she and P.S. move back to the United States:

> **Respondent:** I have been thinking a lot about everything that's been said and I had spoken to my lawyer to advise you tomorrow. I would like to move back to the [S]tates with [P.S.] I do understand what that entails[,] so please hear me out. I would like to suggest visitations back and forth and during school holidays. Still calls on FaceTime weekly that would suit you and myself as well as any major events like a birthday. Essentially it would be what I've been doing here for the last [ten] years. That way I can have family support with him in the [S]tates close to my sister[,] and my mom and [stepfather] have said they would get a place close by to help. In the interim of trying to figure all of this out, I would be happy for you to see him every other weekend (probably the one you have [A.S.]) as well as two

---

[1] Petitioner testified that he used an old cell phone to record the conversation, which he later destroyed. He did so, however, knowing that litigation was anticipated and after Respondent requested by text that he send her a copy of the recording.

calls per week that we can agree on. I do want to try and figure something out between us that's going to work.

**Petitioner:** Thanks for the update. I'm happy for the bottom interim agreement of the weekend visits and calls. As soon as I have a place[,] we can discuss that further.

I understand the need to be nearby family for support. But I must admit I don't see how I could afford such an expense with minimum [three] term holidays and a[n]end[-]of[-]year break, or how you expect a [five][-]year[-]old to travel on an over [twenty-four-hour] flight and across major airports. Or what's to stop you from just not sending him at all when you leave[?] [ T]o enforce such a thing would be a major undertaking from either end. But if that has to be decided by the court[,] then I'd say that's how it will be[.]

**Respondent:** At first the visits would be difficult and I can understand that. That's why I, as an idea, was going to facilitate a lot of FaceTime calls as well as letters back and forth. The visits I was thinking of could be a stretch of [three-]ish weeks annually over summer/[]winter holidays. There is a possibility of meeting half[]way as well to cut the travel time down or we meet in airports when he goes to you or he comes to me. Not to mention as he gets older[,] it'll be easier to travel back and forth.

**Petitioner:** Would you be happy with this offer from me? Like [if I] told you to go and trust me[, I']ll send him[,] you would just agree? How would I pay for this year after year?

Look. You've answered my question. And the lengths that you['re] going to compared to all I asked was you [to] stay in a motel for [two] nights like you asked me to still baffles me. But this discussion will be had with lawyers[,] . . . I think. I'll let you know when we can start with interim custody and go from there[.]

(Resp't Ex. T.)

28.     After negotiating over the next few days, Petitioner discussed the possibility of Respondent and P.S. moving to the United States in exchange for Respondent signing over the marital home to him. Respondent told him she could "pack up what we would need and leave in the next week or two. As soon as we've got everything signed off." *Id.* Petitioner asked Respondent for a draft agreement and urged her to formalize it with her attorney so that he and A.S. could move back into the marital

home. Petitioner advised Respondent he intended to seek legal counsel to begin mediation and drafting interim custody orders.

29.    On the morning of September 26, 2025, while discussing when P.S. would next return to Australia for a visit were he to move to the United States with Respondent, Respondent expressed concern that a return for Christmas of 2025 may not be feasible because "the school break for him to come after he spends Christmas with [her] isn't going to be long enough for [Petitioner] and for [P.S.] to be back to school on time." (Resp't Ex. Y.) She proposed that P.S. spend the entire Christmas 2025 period with her in the United States and then "June or Christmas next year with [Petitioner] so [he] can have that longer period with [P.S.]" *Id.* Petitioner rejected that offer:

> **Petitioner:** You want me to go without seeing my son until midway through next year. And when you [specifically] know [I] can[']t take any holidays to spend with him. Because [I] need to take them over shut[]down. No[,] that's not an option to me.
>
> Are you telling me you want me to take him for [six] weeks[?] One go. Every year?
>
> Midway in the year[.]
>
> **Respondent:** I said [three] weeks a year.
>
> **Petitioner:** [Three] weeks a year????
>
> Would you be OK seeing him [three] weeks a year?
>
> I was already hesitant about losing [eleven] and a half months a year. [You] want me to see him less th[a]n a month a year?
>
> **Respondent:** What if we did two weeks over winter break with alternating [Christmas] and three weeks over June/[J]uly school holidays?
>
> I was thinking the three weeks once a year because we would both be able to afford that and then that's less disruptive to [P.S.] I still think that this is the best way forward.
>
> **Petitioner:** What's least disruptive. So [I']ll keep him here [and] I'll send him to you [three] weeks a year. Does that sound good? He goes to school with his current friends. Gets his sister. Seems the least disruptive to me. Or does that sound unfair?
>
> If it's a deal you wouldn't be prepared to take[, t]hen don't offer it. Because IF this goes to court[ a]nd you lose[, t]hat's the deal [you] will get[.]

*Id.*

30.    On September 26, 2025, Respondent's stepfather, with Respondent's knowledge, booked flights for Respondent and P.S. from Sydney, Australia, to the United States on September 29, 2025.

31.    The Parties agreed that P.S. would spend the September 27-28, 2025 weekend with Petitioner and A.S. P.S. did so, and they celebrated P.S.'s birthday in advance, which gives rise to a reasonable inference that Petitioner was aware P.S. might be moving to the United States before his birthday. Petitioner returned P.S. to Respondent on Sunday, September 28, 2025, unaware that Respondent intended to take P.S. out of the country the following morning. Later that Sunday, Petitioner messaged Respondent that he would mail certain items P.S. left behind the following day:

> **Petitioner:** While tidying[,] we found [P.S.'s] blue water bottle and green blanket. Will express post it tomorrow and you should receive it the next day[.]
>
> **Respondent:** Ok[. T]hanks.

(Resp't Ex. Z.) Respondent did not mention her plans to remove P.S. from Australia the following day.

32.    On Monday, September 29, 2025, Respondent texted Petitioner as follows:

> **Respondent:** While we are figuring out everything, I've gone to the States with [P.S.] to be close to my family and have their support. I have mailed the house keys to my lawyer and will need all correspondence to go through her from now on. On[c]e we have this sorted[,] we can begin the weekly video chats with [P.S.] I will be turning off my phone.

*Id.*

> **Petitioner:** "You'[re] kidding me. You['re] insane[.]" (Pet'r Ex. 11.)

33.    Petitioner tried calling Respondent, but his call went to her voicemail. He drove to the airport, called the police, and called Respondent's solicitor. He learned from the Federal Australian Police that Respondent and P.S. had already departed from Australia.

34.    Petitioner subsequently sought an interim child custody order in Australia, with the case number AYC489/2025, in the Federal Circuit and Family Court of Australia

(Division 2). These proceedings are currently ongoing, and no decision has been reached by either the Parties or the court in part because the Australian court has determined that it lacks jurisdiction over P.S. as he is no longer in Australia.

35. The court observed a past but recent video visit between Petitioner, A.S., and P.S. which Respondent monitored. All participants behaved appropriately. Petitioner and P.S., and P.S. and A.S., appeared closely bonded.

36. Although Respondent and A.S. once had a close relationship, A.S. no longer maintains contact with Respondent and Petitioner does not want her to have such contact. Respondent reached out to A.S.'s maternal grandmother to relate her concerns regarding Petitioner. The maternal grandmother alerted Petitioner to this contact.

37. Respondent's therapist, Anne Woodhouse, Ph.D., with whom she also worked, testified via videoconference that Respondent had a passive communication style, had experienced depression and anxiety, and appeared to find Petitioner domineering and intimidating. Dr. Woodhouse did not testify to domestic violence or threats of physical violence perpetrated by Petitioner on Respondent, A.S., or P.S., although she opined that there was "definitely coercive control, financial control, that sort of thing" associated with Respondent's inheritance.

38. Peter Favaro, Ph.D., testified via videoconference and opined that Petitioner's conduct as described by Respondent was "worrisome," especially with access to firearms, but he acknowledged that he did not interview Petitioner, A.S., or P.S. He conceded that the sole basis for his opinions was Respondent's self-reports, a selection of text messages, and police and health records from Petitioner's May 2025 psychiatric hospitalization. Because of these limitations on the basis of his knowledge, the court accords Dr. Favaro's testimony limited weight.

39. The court finds that Petitioner does not pose a risk of physical harm to P.S. The court further finds that Petitioner does not pose a risk of psychological harm to P.S. provided he is subject to restrictions on the manner in which he interacts and communicates with P.S. and Respondent.

## CONCLUSIONS OF LAW

### A.      The Hague Convention.

"The Hague Convention 'was adopted in 1980 in response to the problem of international child abductions during domestic disputes.'" *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). Its purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention Preamble. Both the United States and Australia have ratified the Convention. *See Con. of 25 Oct. 1980 on the Civ. Aspects of Int'l Child Abduction*, HAGUE CONF. ON PRIV. INT'L L.: STATUS TABLE, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Mar. 23, 2026).

"The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (alteration adopted) (internal quotation marks and citation omitted). The Convention "generally requires the 'prompt return' of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* (citing Hague Convention, arts. 1(a), 12). "This requirement 'ensures that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Id.* (alteration adopted) (quoting Hague Convention, art. 1(b)).

"Congress implemented the Convention in [ICARA], 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.*" *Id.* at 671. Pursuant to ICARA, United States district courts have "original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a).

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

12

*Id.* § 9003(b). Courts must "decide the case in accordance with the Convention[,]" *id.* § 9003(d), and may "determine only rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). "[T]he Convention's focus is simply upon whether a child should be returned to [his] country of habitual residence for custody proceedings." *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012).

"Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained." *Golan*, 596 U.S. at 671. A removal is "wrongful" where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. To establish a prima facie case of wrongful removal or retention under the Convention, a petitioner must establish by a preponderance of the evidence that

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

Where the petitioner has established a prima facie case of wrongful removal, "the court must ordinarily 'order the return of the child forthwith.'" *Mota*, 692 F.3d at 113. The respondent, however, may rebut a prima facie case if he or she can establish that "one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); *see also id.* § 9003(e)(2). These narrow exceptions "are to be narrowly read," *Mota*, 692 F.3d at 113, and include:

> [T]he person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention; or
>
> [T]here is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13. However, "[e]ven where a defense has been established, 'it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation.'" *Swett v. Bowe*, 733 F. Supp. 3d 225, 243 (S.D.N.Y. 2024) (quoting *In re D.T.J.*, 956 F. Supp. 2d 523, 529 (S.D.N.Y. 2013)).

The affirmative defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999). "The ultimate custody determination is outside this [c]ourt's purview." *Lomanto v. Agbelusi*, 2023 WL 4118124, at *18 n.12 (S.D.N.Y. June 22, 2023); *cf. Mota*, 692 F.3d at 112 ("The Convention does not establish substantive standards for resolving the merits of any underlying custody dispute."). Instead, the court's analysis is confined to whether removal of the subject child was wrongful and, if so, what remedy should be ordered. *See, e.g.*, *Mota*, 692 F.3d at 112 ("[T]he Convention's focus is simply upon whether a child should be returned to [his] country of habitual residence for custody proceedings."); *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) ("The decision concerning repatriation shall not be taken to be a determination on the merits of any custody issue.") (internal quotation marks and citation omitted).

## B.    Spoliation Inference.

Respondent asks the court for an adverse inference based on Petitioner's destruction of the recording of the September 18, 2025 meeting between the Parties in the marital home to which their mothers were witnesses. A party seeking an adverse inference instruction based on the alleged spoliation of evidence must establish: (1) "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) "that the records were destroyed with a culpable state of mind"; and

14

(3) "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012).

The court agrees that an adverse inference based on spoliation applies, but with four witnesses to the conversation between the Parties, all of whom testified before the court, any negative inference is slight.

### C.  Petitioner's Prima Facie Case.

Respondent does not dispute that P.S.'s habitual residence at the time of removal was Australia and that Petitioner possessed rights of custody over P.S. and was exercising those rights at the time of the removal. Petitioner has thus established a prima facie case of wrongful removal. Accordingly, absent an affirmative defense, P.S. must be returned to Australia.

### D.  Affirmative Defenses.

#### 1.  Consent Defense.

To establish the consent defense, "the respondent must prove by a preponderance of the evidence that petitioner either previously consented or subsequently acquiesced to the removal of the child[]." *Velozny v. Velozny*, 550 F. Supp. 3d 4, 15 (S.D.N.Y. 2021) (citing 22 U.S.C. § 9003(e)(2)(B)). "The consent defense analyzes 'the petitioner's conduct prior to the contested removal or retention[.]'" *Id.* (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). "The consent does not have to be formal[;] instead[,] the [c]ourt must analyze the petitioner's conduct prior to the removal or retention[] and 'consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside [his] home country.'" *Braude v. Zierler*, 2022 WL 3018175, at *6 (S.D.N.Y. July 29, 2022), *aff'd*, 2023 WL 3012269 (2d Cir. Apr. 20, 2023) (quoting *Velozny*, 550 F. Supp. 3d at 15). "The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent." *In re Kim*, 404 F.Supp.2d 495, 516 (S.D.N.Y. 2005).

The Parties do not dispute that Respondent did not tell Petitioner that she was taking P.S. to the United States until it was too late for Petitioner to stop Respondent from

removing P.S. from Australia. At the time, the Parties were negotiating a formal written agreement whereby P.S.'s departure may have been permitted. Petitioner had scheduled an appointment to see his attorney, and Respondent had assured Petitioner in writing that she would not take P.S. out of the country without a court order or his consent. No visitation schedule or child support had been established.

Respondent's surreptitious conduct in removing P.S. without telling Petitioner she was doing so was "inconsistent with [that] of someone who believed that removal was consented to." *Velozny*, 550 F. Supp. 3d at 17. The "deliberately secretive nature of [the] actions [of the removing parent] is extremely strong evidence that [the other parent] would not have consented to the removal." *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) (alterations in original)). "[H]ad Petitioner actually consented to [P.S.] being removed from [Australia], there would have been no need for Respondent's surreptitious conduct." *Velozny*, 550 F. Supp. 3d at 17.

Upon receiving Respondent's message, Petitioner called and texted her. He then drove to the airport and contacted the Australian Federal Police and Respondent's solicitor in an attempt to stop Respondent. He subsequently sought an interim child custody order in Australian courts. "[A] petitioner's conduct *after* removal can further inform whether [he] consented at the time of removal." *Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017) (emphasis in original). In this case, Petitioner's post-removal conduct supports a conclusion that he did not consent to P.S.'s removal.

Although the Parties discussed Respondent and P.S. moving to the United States, these discussions do not preclude a finding of lack of consent as that term is used in the Convention. *See, e.g.*, *Velozny*, 550 F. Supp. 3d at 16-17 (holding that the petitioner did not consent to removal where emails showed the petitioner discussed the respondent and children moving to New York with his father-in-law but eventually rejected the idea of sending the children there and where the agreement remained "in draft form and unexecuted[]"); *Braude*, 2022 WL 3018175 at *7 (concluding that the petitioner did not consent to removal despite discussions that respondent and the children should move to

16

the United States and the petitioner giving respondent the children's birth certificates). "The [P]arties were clearly in negotiations about the terms of their divorce, child custody, and visitation arrangements, but it is also clear that no agreement was ever reached." *Velozny*, 550 F. Supp. 3d at 16. Respondent has therefore failed to establish by a preponderance of the evidence that the affirmative defense of consent applies.

### 2.    Grave Risk of Harm Defense.

"To qualify as a grave risk of harm, 'the potential harm to the child must be severe, and the level of risk and danger' associated with that harm must also be 'very high.'" *Swett*, 733 F. Supp. 3d at 287 (alteration adopted) (quoting *Souratgar*, 720 F.3d at 103).

> Under Article 13(b), a grave risk of harm from repatriation arises in two situations: "(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection."

*Souratgar*, 720 F.3d at 103 (emphasis in original) (quoting *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) (abrogated on other grounds by *Golan v. Saada*, 596 U.S. 666 (2022))). Whether a grave risk exists depends "not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.* (citing *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)). Pursuant to ICARA, the respondent must establish such a risk by "clear and convincing evidence[.]" 22 U.S.C. § 9003(e)(2)(A).

Respondent contends that returning P.S. to Australia represents "a grave risk of harm" to P.S. due to exposure to spousal abuse, characterizing Petitioner as volatile, domineering, and controlling. She claims that the incident at P.S.'s kindergarten orientation constitutes domestic violence and that Petitioner had demonstrated a consistent pattern of coercive control over Respondent, A.S., and P.S.

"Spousal abuse . . . is only relevant under Article 13(b) if it seriously endangers the child. The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a

17

grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 103-04 (citing *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010) (per curiam)). Although evidence of "prior spousal abuse . . . can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse[,] [e]vidence of this kind . . . is not dispositive in these fact-intensive cases." *Id.* at 104 (internal quotation marks and citations omitted).

In cases where courts in the Second Circuit have found "that evidence of prior spousal abuse *alone*, even if not directed at the child, . . . support[s] invocation of the grave risk defense[,]" the "abuse is generally serious, recurring, and (at times) perpetrated in the presence of the child." *Mene v. Sokola*, 2024 WL 4227788, at *18 (S.D.N.Y. Sept. 17, 2024) (emphasis in original) (collecting cases).[2] "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Souratgar*, 720 F.3d at 104.

Respondent compares this case with *Davies v. Davies*, in which the Second Circuit affirmed the trial court's grave risk of harm determination based on "overwhelming evidence of [petitioner's] extreme violence and uncontrollable anger, as well as his psychological abuse of [respondent] over many years, much of which was witnessed by [the child], and the fact that [petitioner] frequently screamed and yelled at [the child] for

---

[2] *Compare In re D.T.J.*, 956 F. Supp. 2d 523, 545 (S.D.N.Y. 2013) (finding grave risk of harm where child "was never physically assaulted by [petitioner]" but was verbally abused and was privy to numerous instances of petitioner's physical abuse of her mother), and *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005) (finding grave risk of harm due to, among other things, petitioner's "inability to control his temper," and "pattern of domestic abuse[,]" although petitioner had never physically abused child), *with In re Filipczak*, 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011) (granting repatriation petition even though child had witnessed one incident of spousal abuse as a two-year-old), *Rial v. Rijo*, 2010 WL 1643995, at *2-3 (S.D.N.Y. Apr. 23, 2010) (ordering repatriation of child despite evidence that petitioner was verbally and sometimes physically abusive to respondent and that child was "present for at least some of this abuse"), *and Lachhman v. Lachhman*, 2008 WL 5054198, at *9 (E.D.N.Y. Nov. 21, 2008) (concluding that evidence of petitioner's previous arrest, but not conviction, on domestic abuse charges was insufficient to establish grave risk where there was no evidence that petitioner had ever harmed child).

18

no legitimate reason." 717 F. App'x 43, 48-49 (2d Cir. 2017) (emphasis omitted) (summary order). The two cases are easily distinguishable.

In *Davies*, the Second Circuit noted "[the petitioner's] sustained pattern of abusing [the respondent] in [the child's] presence" included "yelling at her and pushing her out of the way while [the child] stood by; ripping [the child] out of her arms; and screaming in her face because [the child] wanted to sleep with her." *Id.* at 47-48. The petitioner in *Davies* also directed abuse at the child, including "spanking [the child] so hard that he left a hand-print; slamming on his car's brakes to teach [the child] to put on his seatbelt; screaming profanities at him; throwing [the child's] toys and other objects in anger; and forcefully pushing [the child] out of the room to berate [the respondent]." *Id.* at 48.

In contrast, in this case there is no pattern of domestic violence and, indeed, Respondent denied the presence of domestic violence to Petitioner's psychiatrist in May of 2025. The incident at P.S.'s kindergarten orientation, while unfortunate, did not rise to the level of physical abuse of either Respondent or P.S. There is also no other evidence of physical abuse or threats of physical violence towards P.S. Although Respondent alleges financial abuse, no court has apparently recognized a "grave risk of harm" on this basis. In any event, Respondent successfully rebuffed Petitioner's pressure to spend her inheritance on his business ventures. While Respondent was credible in her description of Petitioner as domineering and authoritative, it appears that behavior stopped short of verbal abuse, threats of physical harm, isolation from family and friends, and depriving Respondent of the right to her own money and the ability to work outside the home.

Respondent's comparison to the facts of *Braude* is equally unpersuasive. In *Braude*, the court found a grave risk of harm based on the petitioner's "long and serious history of untreated mental health issues[,]" including a diagnosis of borderline personality disorder for which the petitioner had not yet received treatment and a history of "suicidal ideation and attempts since the age of ten[,]" including a suicide attempt when the child "was asleep in the house." 2022 WL 3018175, at *8. In *Braude*, the court found that the petitioner had strangled the respondent "to the point of almost passing out." *Id.* But "perhaps most important" to the *Braude* court was "the [p]etitioner's arrest

19

for access and possession of child pornography[,]" which "increased [the] risk of contact sexual abuse." *Id.* at *9.

Unlike *Braude*, Petitioner does not have a diagnosed personality disorder and, although Petitioner experienced suicidal ideation for a brief period of time due to stresses at work, he did not act on this ideation at any time. There are no allegations of child pornography or a sexual interest in children. Petitioner previously had an active firearms license and possessed firearms, but his license has lapsed and his firearms have been relinquished. He does not intend to renew his firearms license. The totality of the evidence establishes he is an engaged and devoted father to P.S.

For the reasons stated above, Respondent has failed to prove by clear and convincing evidence that returning to Australia presents a grave risk of harm to P.S.

## CONCLUSION

For the foregoing reasons, the court GRANTS Petitioner's motion to return P.S. to Australia. (Doc. 1.) P.S. shall be returned to Australia forthwith for an Australian court to decide issues related to P.S.'s custody and in no event no more than thirty (30) days from this Opinion and Order. The court hereby ORDERS that by April 3, 2026, at 5:00 p.m., the Respondent shall file a plan for the safe return of P.S. to Australia, which shall include P.S.'s travel itinerary, and proof thereof, and which shall direct the Clerk of Court to release P.S.'s passports to the adult with whom P.S. will travel.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of March, 2026.

Christina Reiss, Chief Judge
United States District Court